JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jerry Pinnell, Jeremy Fernandez and Shane Perrilloux, individually and on behalf of all others similary affected,

**(b)** County of Residence of First Listed Plaintiff   Maricopa County, AZ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Donald R. Reavey, Esquire            (717) 233-4101
Capozzi Adler, P.C.
2933 North Front Street, Harrisburg, PA  17110

## DEFENDANTS

TEVA Pharmaceuticals USA, Inc., et al.

County of Residence of First Listed Defendant   Montgomery County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine / ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice / ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | / ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | ☒ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | / ☐ 550 Civil Rights | | | |
| | / ☐ 555 Prison Condition | | | |
| | / ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. § 1024(b)(4) and Section 502(c)(1)(B), 29 U.S.C. § 1132(c)(B)
Brief description of cause:
Failure to comply with written request for documents from Plan Administrator

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
$200,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   12/05/2019

SIGNATURE OF ATTORNEY OF RECORD   Donald R. Reavey

DEC 6 2019

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

19    5738 

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff:   P.O. Box 1776, Phoenix, AZ 85011; 2031 Dewey Street, Apt. 201 Hollywood, FL  33020; 502 Perrilloux Road, Madisonville, LA  70447

Address of Defendant:   1090 Horsham Road, North Wales, PA  19454

Place of Accident, Incident or Transaction:   Montgomery County

---

*RELATED CASE, IF ANY:*

Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1.  Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

2.  Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

3.  Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☑

4.  Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not  related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 12/05/2019     *Donald R. Reavey*     82498
                      *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

CIVIL: (Place a √ in one category only)

A.    *Federal Question Cases:*

☐   1.   Indemnity Contract, Marine Contract, and All Other Contracts
☐   2.   FELA
☐   3.   Jones Act-Personal Injury
☐   4.   Antitrust
☐   5.   Patent
☐   6.   Labor-Management Relations
☐   7.   Civil Rights
☐   8.   Habeas Corpus
☐   9.   Securities Act(s) Cases
☐   10.  Social Security Review Cases
☑   11.  All other Federal Question Cases
         *(Please specify):* _____ ERISA _____

B.    *Diversity Jurisdiction Cases:*

☐   1.   Insurance Contract and Other Contracts
☐   2.   Airplane Personal Injury
☐   3.   Assault, Defamation
☐   4.   Marine Personal Injury
☐   5.   Motor Vehicle Personal Injury
☐   6.   Other Personal Injury *(Please specify):* _____
☐   7.   Products Liability
☐   8.   Products Liability – Asbestos
☐   9.   All other Diversity Cases
         *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I,    Donald R. Reavey                        , counsel of record *or pro se plaintiff*, do hereby certify:

☑   Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐   Relief other than monetary damages is sought.

DEC - 6 2019

DATE: 12/05/2019     *Donald R. Reavey*     82498
                      *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

CIVIL ACTION

Jerry Pinnell, Jeremy Fernandez and Shane Perrilloux,
Individually and on behalf of all others similarly situated,
Plaintiffs

v.

TEVA Pharmaceuticals USA, Inc., Board of Directors of TEVA
Pharmaceuticals USA, Inc., Dr. Sol J. Barer, Kare Schultz, Rosemary
A. Crane, Amir Elstein, Murray A. Goldberg, Jean-Michel Halfon, Gerald
M. Lieberman, Roberto A. Migone, Dr. Parry D. Nisen, Nechemia J. Peres,
Ronit Satchi-Fainaro, TEVA Pharmaceuticals USA, Inc. Investment Committee,
And John and Jane Does 1-30,
Defendants

19      5738

NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus- Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security -- Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration- Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)          ( )

(f) Standard Management- Cases that do not fall into any one of the other tracks.   (X)

| | | |
|---|---|---|
| 12/5/19 | Donald R. Reavey | Plaintiffs |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (717) 233-4101 | (717) 233-4103 | DonR@capozziadler.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

DEC - 6 2019

(Civ. 660) 10/02

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JERRY PINNELL, JEREMY FERNANDEZ AND SHANE PERRILLOUX, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TEVA PHARMACEUTICALS USA, INC., BOARD OF DIRECTORS OF TEVA PHARMACEUTICALS USA, INC., DR. SOL J. BARER, KARE SCHULTZ, ROSEMARY A. CRANE, AMIR ELSTEIN, MURRAY A. GOLDBERG, JEAN-MICHEL HALFON, GERALD M. LIEBERMAN, ROBERTO A. MIGONE, DR. PARRY D. NISEN, NECHEMIA J. PERES, RONIT SATCHI-FAINARO, TEVA PHARMACEUTICALS USA, INC. INVESTMENT COMMITTEE, and JOHN AND JANE DOES 1-30.<br><br>Defendants. | CIVIL ACTION NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

19    5738

Plaintiffs Jerry Pinnell, Jeremy Fernandez and Shane Perrilloux ("Plaintiffs"), by and through their attorneys, on behalf of the Teva Pharmaceuticals Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.   INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Plan's fiduciaries, which include Teva Pharmaceuticals USA, Inc. ("Teva" or the "Company"), the Board of Directors of Teva ("Board") and its current and former members, and the Teva Pharmaceuticals USA, Inc. Investment Committee and any former committees serving a similar function ("Committee") and its current and former members for breaches of their fiduciary duties.

2.      Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement.  As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans.  *See,* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), available at https://www.ici.org/research/stats/retirement/ret_15_q4; PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015), available at http://www.plansponsor.com/2015-Recordkeeping-Survey/.

3.      In a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015).  Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

4.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B).

5.      The Plan has nearly $2 billion dollars in assets that are entrusted to the care of the Plan's fiduciaries.  The Plan's assets under management qualifies it as a "jumbo" plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

6.      Plaintiffs allege that during the putative Class Period (December 6, 2013 to June 28, 2019) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost;  and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

7.      To make matters worse, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider collective trusts, commingled accounts, or separate accounts as alternatives to the mutual funds in the Plan, despite their lower fees.

8.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

9.      Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.      JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

11.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.      PARTIES

### Plaintiffs

13.     Plaintiff Jerry Pinnell ("Pinnell") is a citizen and resident of Phoenix, Arizona. During his employment, Plaintiff Pinnell participated in the Plan investing in the options offered by the Plan.

4

14.     Plaintiff Shane Perrilloux ("Perrilloux") resides in Madisonville, Louisiana. During his employment, Plaintiff Perrilloux participated in the Plan investing in the options offered by the Plan.

15.     Plaintiff Jeremy Fernandez ("Fernandez") resides in Hollywood, Florida.  During his employment, Plaintiff Fernandez participated in the Plan investing in the options offered by the Plan and continues to maintain investments in the Plan until, at least, the date of the filing of this Complaint.

16.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

17.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.  Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  Having never managed a jumbo 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable

fee levels and prudent alternatives available to such plans.  Plaintiffs did not and could not review the Committee meeting minutes or other evidence of Defendants' fiduciary decision making, or the lack thereof.[2]  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### Defendants

### Company Defendant

18.     Defendant Teva is incorporated under the laws of the state of Delaware and is headquartered in North Wales, PA.  The Company describes itself as a global pharmaceutical leader and the world's largest generic medicines producer.  Teva is a wholly owned subsidiary of Israel-based Teva Pharmaceutical Industries Ltd.  Teva claims that one in every eight of the 3.88 billion generic prescriptions written in the United States is filled with a Teva product.  Teva operates more than 30 facilities across the United States and its Territories employing more than 9,500 individuals.[3]  Teva is the Plan sponsor.  *See* Summary Plan Description of the Teva Pharmaceuticals Retirement Savings Plan (as of January 1, 2016) ("SPD") at 1; *see also* 2018 Form 5500 at 1.

19.     The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

---

[2] Several weeks prior to filing the instant lawsuit, Plaintiffs requested that the Plan administrator produce meeting minutes of the relevant Plan investment committee(s) but their request was denied.

[3] *See* https://www.tevagenerics.com/about-teva-generics/who-we-are/ and the 2018 Form S-4 filed with the United States Securities and Exchange Commission for Teva Pharmaceuticals Industries Limited, especially Exhibit 21.

20.     The Company's fiduciary status is demonstrated by its Investment Policy Statement which provides that "[t]he Company's Board of Directors created and appointed the Committee to assist Teva Pharmaceuticals USA, Inc. in carrying out its fiduciary responsibility for selecting and monitoring the investment options made available to participants and beneficiaries in the Plan." *See*, Investment Policy Statement at 2.

### Board Defendants

21.     At all times, the Defendant Board and its current and/or former members performed Plan-related fiduciary functions in the course and scope of their employment.

22.     In particular, the Board appoints the members of the Committee. *See*, Investment Policy Statement at 2 ("[t]he Company's Board of Directors created and appointed the Committee…").

23.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

24.     Dr. Sol J. Barer currently serves as the Chairman of the Board of Teva.  Dr. Barer joined Teva a member of its Board of Directors in January of 2015.  He was appointed Chairman of the Board of Directors on February 6, 2017.

25.     Accordingly, Dr. Barer and each of the following current members of the Board all of whom served at some point during the Class Period - Kare Schultz, Rosemary A. Crane, Amir Elstein, Murray A. Goldberg, Jean-Michel Halfon, Gerald M. Lieberman, Roberto A. Migone, Dr. Parry D. Nisen, Nechemia J. Peres, Ronit Satchi-Fainaro - and any member of the Board of Directors who formerly served as a Board Member during the Class Period (referred to herein as John and Jane Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period, because each exercised discretionary

7

authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

26.     Defendant Dr. Barer along with the current Board Members named above and any unknown former Board Members who served during the Class Period, referred to here as John and Jane Does 1-10, for Teva during the Class Period are collectively referred to herein as the "Board Defendants."

### Committee Defendants

27.     Defendant Committee was created and appointed by the Board of Directors. *See*, Investment Policy Statement at 2 ("[t]he Company's Board of Directors created and appointed the Committee…").

28.     The Committee is a named fiduciary under the Plan.  According to the SPD, the Committee "serves as Plan Administrator" and the "plan's named fiduciary is the Plan Administrator."  SPD at 2-3.

29.     The Committee shall, among other things, "select and monitor Plan investment options in compliance with the Employee Retirement Income Security Act (ERISA)," shall "review, on a periodic basis, the current investment options to ensure that those options continue to be appropriate for investment by Plan participants and beneficiaries", shall "undertake on a periodic basis, a review of the Plan's overall investment program relative to the types of investment programs then available in the marketplace to ensure that the current program remains competitive …", shall "develop, review (at least annually) and revise (when necessary) the guidelines established in this Investment Policy Statement" and shall "retain, at its discretion, third-party outside professionals to facilitate and assist with the management and investment of the Plan." *See*, Investment Policy Statement at 2 and 3.

8

30.     The Committee has the discretionary authority to change the number of investment options and the type of investment options from time to time. *See*, Investment Policy Statement at 2 and 3. Specifically, the Committee "may add new investment funds or delete any existing funds at any time." SPD at 10.

31.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

32.     The Committee and the current and former unnamed members of the Committee during the Class Period (referred to herein as John and Jane Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John and Jane Doe Defendants**

33.     To the extent that there are additional officers and employees of Teva who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John and Jane Doe" Defendants 21-30 include, but are not limited to, Teva officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.   THE PLAN

34.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants

9

which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  The Plan is designed to allow participants to "build retirement equity for [their] future."  SPD at 5.

35.     Teva established the Plan on January 1, 1967 *See,* SPD at 1.  Over the years, as the Company has acquired other companies, various retirement plans have merged with the Plan.  The Plan was last amended and restated as of January 1, 2019.  *See* Teva Pharmaceuticals Retirement Savings Plan, as amended and restated effective as of Jan. 1, 2019 ("Plan Doc") at Sec. 1.2

36.     All regular employees of Teva are generally eligible to participate in the Plan.  If an employee does not specifically elect to be part of the Plan, they will be automatically enrolled, unless they affirmatively decline to participate.  *See,* SPD at 6.

37.     Each participant in the Plan may choose to contribute 1% to 75% of their compensation.  SPD at 6.  Further, Teva will make an equal matching contribution to the account of each Participant.  SPD at 7.

38.     In all, each participant's account includes a participant's before-tax and after-tax contributions, rollover contributions (from a prior qualified plan or an IRA rollover), and matching contributions.  SPD at 6-8.

39.     As noted above, the Committee selects the various investment options made available to Plan participants.  The following options were available to Plan participants during the Class Period:

| TRRJX |
| :---: |
| T. Rowe Price Retirement 2035 |

| TRRDX |
| :---: |
| T. Rowe Price Retirement 2040 |

| |
|---|
| TRRKX<br>T. Rowe Price Retirement 2045 |
| TRRMX<br>T. Rowe Price Retirement 2050 |
| TRRNX<br>T. Rowe Price Retirement 2055 |
| TRRLX<br>T. Rowe Price Retirement 2060 |
| TRRFX<br>T. Rowe Price Retirement 2005 |
| TRRAX<br>T. Rowe Price Retirement 2010 |
| TRRGX<br>T. Rowe Price Retirement 2015 |
| TRRBX<br>T. Rowe Price Retirement 2020 |
| TRRHX<br>T. Rowe Price Retirement 2025 |
| TRRCX<br>T. Rowe Price Retirement 2030 |
| FCNTX<br>Fidelity® Contrafund® |
| FLPSX<br>Fidelity® Low-Priced Stock |
| TILCX<br>T. Rowe Price Instl Large Cap Value |
| PJSQX<br>PGIM Jennison Small Company R6 |

| |
|---|
| **CSZIX**<br>Cohen & Steers Real Estate Securities Z |
| **VINIX**<br>Vanguard Institutional Index I |
| **VEMPX**<br>Vanguard Extended Market Index InstlPlus |
| **VBMFX**<br>Vanguard Total Bond Market Index Inv |
| **VDVIX**<br>Vanguard Developed Markets Index Inv |
| **FDIVX**<br>Fidelity® Diversified International |
| **LZEMX**<br>Lazard Emerging Markets Equity Instl |
| **JHYUX**<br>JPMorgan High Yield R6 |
| **VIPSX**<br>Vanguard Inflation-Protected Secs Inv |
| **VWENX**<br>Vanguard Wellington,,¢ Admiral,,¢ |
| **PRTXX**<br>T. Rowe Price US Treasury Money |

40.    If a participant fails to make any investment allocations, their 401(k) personal contributions and matching contributions will be invested in the "qualified default investment alternative" that is selected by the Plan Administrator in accordance with Department of Labor guidelines.  SPD at 11.

41.     Plan participants are immediately 100% vested in any personal contributions they make to the Plan but are not vested in any matching contributions made by Teva until 3 years after service at which time they are considered 100% vested.  SPD at 2.

42.     As of January 1, 2018, the Plan had more than $1.9 billion in assets under management.  *See* 2018 Summary Annual Report for the Plan ("2018 Summary Annual Report").

## V.     CLASS ACTION ALLEGATIONS

43.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between December 6, 2013 and June 28, 2019 (the "Class Period").

44.     The members of the Class are so numerous that joinder of all members is impractical.  A total of 11,868 persons were participants in or beneficiaries of the Plan at the end of the plan year 2018.

45.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

46.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.     Whether the Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

47.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

48.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

14

49.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.   DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

50.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

51.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

52.     As described in the Parties section above, Defendants were fiduciaries of the Plan because:

    (a)     they were so named; and/or

    (b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

53.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence and are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019).

54.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . .. A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

55.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons.

16

56.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).  "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio." *In re Amer. Int'l Grp., Inc. ERISA Litig. II*, No. 08-cv-5722, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)).

57.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

58.     During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investment fund options chosen for a plan should not favor the fund provider over the plan's participants.  Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund

17

investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

59.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have an independent system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  Additionally, Defendants failed to leverage the size of the Plan to negotiate lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period.

60.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.   SPECIFIC ALLEGATIONS

### A.   Improper Management of an Employee Retirement Plan Can Cost a Plan's Participants Millions in their Savings

61.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA") § 7.

62.     "The Restatement ... instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1190 (9th Cir. Dec. 30, 2016) *(en banc)* (quoting Restatement (Third) of Trust § 90, cmt. b).  *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/

18

ebsa/ publications/ 401k_employee.html (last visited August 18, 2017) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan."). As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1190 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

63.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. *See,* Brandon, Emily, "The Top 10 Sources of Retirement Income," available at http://money.usnews.com/ money/ blogs/ planning-to-retire/ 2014/05/13/ the-top-10-sources-of-retirement-income ("The 401(k) is the major source people think they are going to rely on."). Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

64.     In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See "A Look at 401(k) Plan Fees," supra.*

65.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses,* (July

19

2016), at 4. "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.* at 5.

66.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, that sorts mutual funds of all kinds into categories "based on the underlying securities in each portfolio...We place funds in a given category based on their portfolio statistics and compositions over the past three years." *See,* http://www.morningstar.com/ InvGlossary/ Morningstar _category.aspx.[5]

67.     On average, there are lower expense ratios for 401(k) participants than those for other investors. *See The Economics of Providing 401(k) Plans,* at 11.   ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones with over a $1 billion in assets managed, lead to economies of scale and special pricing within mutual funds. *See id* at 10.

68.     This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000.  In fact, these expense ratios fell 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds. *See id.* at 1.

---

[5] As described by Morningstar, these categories "were introduced in 1996 to help investors make meaningful comparisons between mutual funds.  Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested...[we] solved this problem by breaking portfolios into peer groups based on their holdings. The categories help investors identify the top performing funds, assess potential risk, and build well-diversified portfolios." *See The Morningstar Category Classifications* (June 30, 2016), at 7.  These categories are assigned to mutual funds, variable annuities, and separate accounts. *Id.*

69.    The most recent comprehensive average mutual fund expense data for plans of different sizes is from 2012, and industry analysts have recognized a marked trend toward lower fees in 401(k)s over the past four years. *See* Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL STREET JOURNAL (May 15, 2016), available at http://www.wsj.com/ articles/ 401-k -fees -already -low -are -heading -lower -1463304601 (noting precipitous drop in overall 401(k) fees from 2012 to 2014).

70.    The following figure published by the ICI best illustrates that 401(k) plans on average pay far lower fees than regular industry investors, even as expense ratios for all investors continued to drop for the past several years.[6]

FIGURE 7
Average Total Mutual Fund Expense Ratios
Percent, 2013–2015

|  | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|
|  | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| Equity funds | 0.74 | 0.58 | 0.70 | 0.54 | 0.68 | 0.53 |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| Hybrid funds | 0.80 | 0.57 | 0.78 | 0.55 | 0.77 | 0.54 |
| Bond funds | 0.61 | 0.48 | 0.57 | 0.43 | 0.54 | 0.38 |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| Money market funds | 0.17 | 0.19 | 0.13 | 0.16 | 0.14 | 0.16 |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

---

[6] This chart does not account for the strategy of a mutual fund, which may be to mirror an index, a so-called passive management strategy, or may attempt to "beat the market" with more aggressive investment strategies via active management. Active management funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research and monitoring than funds which merely attempt to replicate a particular segment of the market.

21

*Id.* at 12.

71.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

### 1.   Passively Managed Funds Cost Less Than Actively Managed Funds

72.     Each investment option within the Plan charged certain fees, to be paid by deductions from the pool of assets under management.  For passively managed funds, which are designed to mimic a market index such as Standard & Poor's 500, securities were purchased to match the mix of companies within the index.  Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

73.     By contrast, actively managed funds, which have a mix of securities selected in the belief they will beat the market, have higher fees, to account for the work of the investment managers of such funds and their associates.

74.     While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/ 2015/06/26/ index -funds -trounce -actively-managed -funds -study.html ("long-term data suggests that actively managed funds "lagged their

passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

75.     Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

76.     "[T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds. Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

## 2.  Institutional Share Classes Cost Less than Retail Share Classes

77.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

78.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available. Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative. Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available. For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

79.     One recent article written by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin (exec. chairman of fi360 Inc.), *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENTNEWS (Jan. 21, 2016), available at http://www.investmentnews.com/ article/ 20160121/ BLOG09/ 160129985/ recent -class -action - surge -ups -the -ante -for-401-k -advice. Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, slip op. at 13 (C.D. Cal. Aug. 16, 2017).

80.     As one commentator put it, "The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a

24

fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach." Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, PLAN SPONSOR (Jan. 2011) available at http://www.plansponsor.com/ Magazine Article. aspx? id = 6442476537.

81.     This claim is not about the use of "retail mutual funds" versus the use of "institutional mutual funds." Retail mutual funds are perfectly acceptable and prudent choices under certain circumstances. In some instances, a mutual fund company may only offer retail mutual funds. Or, in other instances, the mutual fund company might restrict institutional share classes in such a manner that would make it impossible to utilize the mutual funds. This claim is instead about utilizing the lowest-cost class of shares that is available to the Plan.

### 3.  Collective Trusts and Separate Accounts Cost Less Than Their Virtually Identical Mutual Fund Counterparts

82.     The investment options offered within the Plan were mostly pooled investment products known as mutual funds. Throughout the Class Period, the investment options available to participants were almost exclusively mutual funds.

83.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees. Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.

84.     Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash. Regulated by the Office of the Comptroller of the

Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses. As a result, their costs are much lower, with less or no administrative costs, and less or no marketing or advertising costs. *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

85.     Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[7]  Indeed, as of 2012, among plans over $1 billion in size, more assets were held in collective trusts than in mutual funds. *See,* Investment Company Institute, *A Close Look at 401(k) Plans*, at 21, 23 (Dec. 2014), available at https://www.ici.org/ pdf/ ppr_ 14_ dcplan _ profile _ 401k.pdf.

---

[7] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/ news/ cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground). Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. Use of CITs in DC Plans Booming; CITs Gaining Ground. And because collective trusts contract directly with the Plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act. Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/ Tools/ Function/ Trust/Documents/ ABA% 20Primer% 20on% 20Bank% 20Collective% 20Investment% 20Funds.pdf.

86.     Thus, a prudent fiduciary managing a plan with over $1 billion in assets will give serious consideration to the use of separate accounts or collective trusts, and in the majority of cases, will opt to move out of mutual funds.

87.     In an apparent admission against interest, on June 28, 2019, the Defendants converted all the investments in the Plan to collective trusts. It is for this reason that the Class Period is defined as being from December 6, 2013 to June 28, 2019. There is no excuse for the delay in making these conversions when a prudent fiduciary would have done so by the beginning of the Class Period.

88.     Separate accounts are another type of investment vehicle similar to collective trusts, which retain their ability to assemble a mix of stocks, bonds, real property and cash, and their lower administrative costs.

89.     Separate accounts are widely available to large plans such as the Plan, and offer a number of advantages over mutual funds, including the ability to negotiate fees. Costs within separate accounts are typically much lower than even the lowest-cost share class of a particular mutual fund. By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), available at https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds").

**B.     Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

90.     The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015). In *Tibble*, the Court

held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828.  In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

91.     The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets. . . ."  135 S. Ct. at 1828 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id.* § 2 comment.

92.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

93.     As the amount of assets under management approaches and exceeds $1 billion, economies of scale dictate that very low cost investment options will be available to such plans. When large plans, particularly those with over $1 billion in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than

the average institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

94.     During the Class Period, the Plan retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.

95.     During the Class Period, the Plan lost millions of dollars in offering investment options that had similar or virtually identical characteristics to other investment options other than a higher price.

96.     For example, as of the end of 2017, twenty-two out of twenty-seven funds in the Plan were much more expensive than comparable funds available in the market-place.  The T. Rowe Price Retirement, 2035, 2040, 2045, 2050, 2055 and 2060 target date funds had expense ratios of .70%, .72%, .72%, .72%, .72% and .72% respectively, which were 25% more than the category median fee of 0.56% as reported by the Investment Company Institute in 2015 (hereafter, "ICI Study").  The Fidelity Contrafund and the Cohen and Steers Real Estate Securities Z had .82% and .79% expense ratios, respectively, nearly *three times* the 0.31% median for domestic equity funds.  Fidelity Diversified International and Lazard Emerging Markets had expense ratios of .81% and 1.07% nearly *twice* the .49% ICI median for international equity funds. Other funds in the Plan had similarly significantly higher expense ratios than the median price for funds in the same category in similarly-sized plans.

97.     The foregoing comparisons are indicated below:

| Fund | ER | Category | ICI Median Fee |
|---|---|---|---|
| TRRJX<br>T. Rowe Price<br>Retirement 2035 | 0.70 % | Target Date Fund | 0.56% |
| TRRDX<br>T. Rowe Price<br>Retirement 2040 | 0.72 % | Target Date Fund | 0.56% |
| TRRKX<br>T. Rowe Price<br>Retirement 2045 | 0.72 % | Target Date Fund | 0.56% |
| TRRMX<br>T. Rowe Price<br>Retirement 2050 | 0.72 % | Target Date Fund | 0.56% |
| TRRNX<br>T. Rowe Price<br>Retirement 2055 | 0.72 % | Target Date Fund | 0.56% |
| TRRLX<br>T. Rowe Price<br>Retirement 2060 | 0.72 % | Target Date Fund | 0.56% |
| TRRGX<br>T. Rowe Price<br>Retirement 2015 | 0.57 % | Target Date Fund | 0.56% |
| TRRBX<br>T. Rowe Price<br>Retirement 2020 | 0.61 % | Target Date Fund | 0.56% |
| TRRHX<br>T. Rowe Price<br>Retirement 2025 | 0.64 % | Target Date Fund | 0.56% |
| TRRCX<br>T. Rowe Price<br>Retirement 2030 | 0.67 % | Target Date Fund | 0.56% |
| FCNTX<br>Fidelity® Contrafund® | 0.82 % | Domestic Equity | 0.31% |
| FLPSX<br>Fidelity® Low-Priced Stock | 0.62 % | Domestic Equity | 0.31% |
| TILCX<br>T. Rowe Price Instl Large Cap Value | 0.57 % | Domestic Equity | 0.31% |
| PJSQX<br>PGIM Jennison Small Company R6 | 0.68 % | Domestic Equity | 0.31% |

| Fund | ER | Category | ICI Median Fee |
|---|---|---|---|
| CSZIX<br>Cohen & Steers Real Estate Securities Z | 0.79 % | Domestic Equity | 0.31% |
| VBMFX<br>Vanguard Total Bond Market Index Inv | 0.15 % | Index | 0.05% |
| VDVIX<br>Vanguard Developed Markets Index Inv | 0.16 % | Index | 0.05% |
| FDIVX<br>Fidelity® Diversified International | 0.81 % | Int'l Equity | 0.49% |
| LZEMX<br>Lazard Emerging Markets Equity Instl | 1.07 % | Int'l Equity | 0.49% |
| JHYUX<br>JPMorgan High Yield R6 | 0.60 % | Domestic Bond | 0.18% |
| VIPSX<br>Vanguard Inflation-Protected Secs Inv | 0.20 % | Domestic Bond | 0.18% |
| PRTXX<br>T. Rowe Price US Treasury Money | 0.39 % | Money Market | 0.10% |

98.     These comparisons actually understate the excessiveness of fees in the Plan in 2017. That is because the median fees are for all plans, not just jumbo plans, which have lower expense ratios than smaller plans, and the ICI study was conducted in 2015 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.

99.     Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available that offered lower expenses than the median.

100.    As demonstrated by the chart below, in several instances, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class and/or collective trusts available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost.

| Fund | 2019 Exp Ratio | Identical Lower Cost Share Class/ Collective Trust Analog[8] | 2019 Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| T. Rowe Price Retirement 2035 | 0.70 % | T. Rowe Price Retirement I 2035 I | 0.56 % | Target Date Fund | 25% |
| | | T. Rowe Price Retirement 2035 Tr-A | 0.46% | | 52% |
| T. Rowe Price Retirement 2040 | 0.72 % | T. Rowe Price Retirement I 2040 I | 0.58% | Target Date Fund | 24% |
| | | T. Rowe Price Retirement 2040 Tr-A | 0.46% | | 56% |
| T. Rowe Price Retirement 2045 | 0.72 % | T. Rowe Price Retirement I 2045 I | 0.59% | Target Date Fund | 22% |
| | | T. Rowe Price Retirement 2045 Tr-A | 0.46% | | 56%% |
| T. Rowe Price Retirement 2050 | 0.72 % | T. Rowe Price Retirement I 2050 I | 0.59% | Target Date Fund | 22% |
| | | T. Rowe Price Retirement 2050 Tr-A | 0.46% | | 56%% |
| T. Rowe Price Retirement 2005 | 0.54 % | T. Rowe Price Retirement I 2005 I | 0.40 % | Target Date Fund | 40% |
| | | T. Rowe Price Retirement 20005 Tr-A | 0.46% | | 14.8% |
| T. Rowe Price Retirement 2010 | 0.54 % | T. Rowe Price Retirement I 2010 I | 0.43 % | Target Date Fund | 25% |
| | | T. Rowe Price Retirement 2010 Tr-A | 0.46% | | 17% |
| T. Rowe Price Retirement 2015 | 0.57 % | T. Rowe Price Retirement I 2015 I | 0.43 % | Target Date Fund | 32% |
| | | T. Rowe Price Retirement 2015 Tr-A | 0.46% | | 24% |
| T. Rowe Price Retirement 2020 | 0.61 % | T. Rowe Price Retirement I 2020 I | 0.47 % | Target Date Fund | 30.0% |
| | | T. Rowe Price Retirement 2020 Tr-A | 0.46% | | 33% |
| T. Rowe Price Retirement 2025 | 0.64 % | T. Rowe Price Retirement I 2025 I | 0.50 % | Target Date Fund | 28% |

[8] Where appropriate, each cell in this column references both a lower cost share class (identified first) and a collective trust version of the fund (identified second). The listed expense figures are taken from the most recent summary prospectus as of September 4, 2019.

| Fund | 2019 Exp Ratio | Identical Lower Cost Share Class/ Collective Trust Analog[8] | 2019 Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| | | T. Rowe Price Retirement 2025 Tr-A | 0.46% | | 39% |
| T. Rowe Price Retirement 2030 | 0.67 % | T. Rowe Price Retirement I 2030 I | 0.53 % | Target Date Fund | 26% |
| | | T. Rowe Price Retirement 2030 Tr-A | 0.46% | | 46% |
| Vanguard Institutional Index I | 0.04 % | Fidelity® 500 Index | 0.02 % | Index | 100% |
| Vanguard Total Bond Market Index Inv | 0.15 % | Vanguard Total Bond Market  Idx ADM | 0.05 % | Index | 200% |

101.    The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and/or collective trusts, and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

102.    As a jumbo plan, the Plan had sufficient assets under management at all times during the Class Period to qualify for lower share classes which often have a million dollars as the minimum for a particular fund.  "Investment minimums for [collective trusts] are often $10 million, but will vary." See https://www.nb.com/en/us/insights/collective-investment-trusts-what-you-need-to-know.

103.    For example, as relevant in this case, Vanguard institutional share classes only had a minimum investment of $5 million. Beginning in 2017, T.Rowe Price required only a minimum of $20 Million to qualify for a collective trust. Prior to 2017, the amount was $50 Million.

104.    At all relevant times during the Class Period each of the funds had assets under management that were multiples of the minimum needed to qualify for institutional share classes

33

or collective trusts.  For illustrative purposes, the following chart shows the Plan's assets under management on a fund by fund basis in 2017:

| Fund | Category | AUM |
|------|----------|-----|
| TRRJX<br>T. Rowe Price<br>Retirement 2035 | Target Date Fund | $13,719,759 |
| TRRDX<br>T. Rowe Price<br>Retirement 2040 | Target Date Fund | $120,0334,424 |
| TRRKX<br>T. Rowe Price<br>Retirement 2045 | Target Date Fund | $82,717,941 |
| TRRMX<br>T. Rowe Price<br>Retirement 2050 | Target Date Fund | $28,808,464 |
| TRRNX<br>T. Rowe Price<br>Retirement 2055 | Target Date Fund | $10,300,549 |
| TRRGX<br>T. Rowe Price<br>Retirement 2015 | Target Date Fund | $18,794,270 |
| TRRBX<br>T. Rowe Price<br>Retirement 2020 | Target Date Fund | $83,414,199 |
| TRRHX<br>T. Rowe Price<br>Retirement 2025 | Target Date Fund | $104,126,744 |
| TRRCX<br>T. Rowe Price<br>Retirement 2030 | Target Date Fund | $14,1041,423 |
| FCNTX<br>Fidelity® Contrafund® | Domestic Equity | $213,024,562 |
| FLPSX<br>Fidelity® Low-Priced<br>Stock | Domestic Equity | $78,278,376 |
| TILCX<br>T. Rowe Price Instl<br>Large Cap Value | Domestic Equity | $65,438,653 |

34

| Fund | Category | AUM |
|------|----------|-----|
| PJSQX<br>PGIM Jennison Small Company R6 | Domestic Equity | $50,364,861 |
| CSZIX<br>Cohen & Steers Real Estate Securities Z | Domestic Equity | $23,390,357 |
| VBMFX<br>Vanguard Total Bond Market Index Inv | Index | $56,792,471 |
| VDVIX<br>Vanguard Developing Markets Index Inv | Index | $45,733,175 |
| FDIVX<br>Fidelity® Diversified International | Int'l Equity | $30,088,887 |
| LZEMX<br>Lazard Emerging Markets Equity Instl | Int'l Equity | $21,015,007 |
| JHYUX<br>JPMorgan High Yield R6 | Domestic Bond | $15,695,927 |
| VIPSX<br>Vanguard Inflation-Protected Secs Inv | Domestic Bond | $9,136,991 |
| PRTXX<br>T. Rowe Price US Treasury Money | Money Market | $32,001,922 |

105.    A prudent fiduciary conducting an impartial review of the Plan's investments would have conducted such a review of the Plan's investments on at least a quarterly basis, would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into institutional shares at the earliest opportunity.  Yet, despite the availability of lower-cost shares, Defendants did not transfer Plan holdings in any of these funds from retail shares into institutional shares, in breach of their fiduciary duties.

106.    Additionally, Defendants breached their fiduciary duties by failing to consider collective investment trusts as alternatives to the mutual funds in the Plan. Defendants were or should have been aware at all times during the Class Period aware of the benefits of these alternative investment vehicles.

107.    There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment. The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

108.    Similarly, Defendants cannot justify offering higher-cost mutual funds over collective trusts. The mutual fund versions of Plan investments offered no material service or other advantage to Plan participants over the collective trust versions. The Plan was obligated to provide the same fee, performance, and account information to participants for collective trusts as mutual funds. The only material difference was fees.

109.    The Plan also incurred excess fees due to Defendants' failure to adequately investigate the availability of separate accounts in the same investment style of mutual funds in the Plan. Because of the Plan's size, it could have reaped considerable cost savings by using a separate account, but Defendants again failed to investigate this option.

110.    Unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation. Industry data shows that actual fee schedules on separate accounts are typically lower than advertised fee schedules, particularly when the plan or investor has a large amount of assets to invest, as did the Plan here.

111.    In summary, beginning at the start of the Class Period, Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan. By failing to investigate the use of separate

account and collective trust alternatives to the mutual funds held by the Plan prior to the end of the Class Period, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

112.    Defendants also failed to consider materially similar but cheaper alternatives to the Plan's investment options.  The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style.  A reasonable investigation would have revealed the existence of these lower-cost alternatives.

| Fund | 2019 Exp Ratio | Passive/Active Lower Cost Alternative[9] | 2019 Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| T. Rowe Price Retirement 2035 | 0.70 % | Fidelity Freedom® Index 2035 Investor | 0.12 % | Target Date Fund | 483% |
|  |  | JPMorgan SmartRetirement Blend 2035 R6 | 0.29 % |  | 141% |
| T. Rowe Price Retirement 2040 | 0.72 % | Fidelity Freedom® Index 2040 Investor | 0.12 % | Target Date Fund | 500% |
|  |  | JPMorgan SmartRetirement Blend 2040 R6 | 0.29 % |  | 148% |
| T. Rowe Price Retirement 2045 | 0.72 % | Fidelity Freedom® Index 2045 Investor | 0.12 % | Target Date Fund | 500% |
|  |  | JPMorgan SmartRetirement Blend 2045 R6 | 0.29 % |  | 148% |
| T. Rowe Price Retirement 2050 | 0.72 % | Fidelity Freedom® Index 2050 Investor | 0.12 % | Target Date Fund | 500% |
|  |  | JPMorgan SmartRetirement Blend 2050 R6 | 0.29 % |  | 148% |
| T. Rowe Price Retirement 2055 | 0.72 % | Fidelity Freedom® Index 2055 Investor | 0.12 % | Target Date Fund | 500% |
|  |  | JPMorgan SmartRetirement Blend 2055 R6 | 0.29 % |  | 148% |
| T. Rowe Price Retirement 2060 | 0.72 % | Fidelity Freedom® Index 2060 Investor | 0.12 % | Target Date Fund | 500% |

---

[9] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second). The listed expense figures are taken from the summary prospectus as of September 4, 2019.

| Fund | 2019 Exp Ratio | Passive/Active Lower Cost Alternative[9] | 2019 Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| | | JPMorgan SmartRetirement Blend 2060 R6 | 0.29 % | | 148% |
| T. Rowe Price Retirement 2005 | 0.54 % | Fidelity Freedom® Index 2005 Investor | 0.12 % | Target Date Fund | 350% |
| | | JPMorgan SmartRetirement Blend 2005 R6 | 0.29 % | | 86% |
| T. Rowe Price Retirement 2010 | 0.54 % | Fidelity Freedom® Index 2010 Investor | 0.12 % | Target Date Fund | 350% |
| | | JPMorgan SmartRetirement Blend 2010 R6 | 0.29 % | | 86% |
| T. Rowe Price Retirement 2015 | 0.57 % | Fidelity Freedom® Index 2015 Investor | 0.12 % | Target Date Fund | 375% |
| | | JPMorgan SmartRetirement Blend 2015 R6 | 0.29 % | | 96% |
| T. Rowe Price Retirement 2020 | 0.61 % | Fidelity Freedom® Index 2020 Investor | 0.12 % | Target Date Fund | 408% |
| | | JPMorgan SmartRetirement Blend 2020 R6 | 0.29 % | | 110% |
| T. Rowe Price Retirement 2025 | 0.64 % | Fidelity Freedom® Index 2025 Investor | 0.12 % | Target Date Fund | 433% |
| | | JPMorgan SmartRetirement Blend 2025 R6 | 0.29 % | | 120% |
| T. Rowe Price Retirement 2030 | 0.67 % | Fidelity Freedom® Index 2030 Investor | 0.12 % | Target Date Fund | 433% |
| | | JPMorgan SmartRetirement Blend 2030 R6 | 0.29 % | | 131% |
| Fidelity® Contrafund® | 0.82 % | TIAA-CREF Large-Cap Gr Idx Instl | 0.05 % | Domestic Equity | 1540% |
| | | Vanguard U.S. Growth Fund Admiral Shares | 0.28 % | | 193% |
| Fidelity® Low-Priced Stock | 0.62 % | Vanguard Mid-Cap Value Index Admiral | 0.07 % | Domestic Equity | 786% |
| | | Vanguard Capital Value Inv | 0.29 % | | 114% |
| T. Rowe Price Instl Large Cap Value | 0.57 % | Vanguard Value Index I | 0.04 % | Domestic Equity | 1325% |
| | | Vanguard Equity-Income Adm | 0.18 % | | 216% |
| PGIM Jennison Small Company R6 | 0.68 % | Vanguard Mid-Cap Growth Index Admiral | 0.07 % | Domestic Equity | 871% |

| Fund | 2019 Exp Ratio | Passive/Active Lower Cost Alternative[9] | 2019 Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| | | Vanguard Capital Value | 0.29% | | 134% |
| Cohen & Steers Real Estate Securities Z | 0.79 % | Fidelity® Real Estate Index | 0.07 % | Domestic Equity | 1029% |
| | | DFA Real Estate Securities I | 0.18% | | 339% |
| Vanguard Institutional Index I | 0.04 % | Fidelity® 500 Index | 0.02 % | Index | 100% |
| Vanguard Extended Market Index InstlPlus | 0.05 % | Fidelity® Mid Cap Index | 0.03 % | Index | 67% |
| Vanguard Total Bond Market Index Inv | 0.15 % | Vanguard Total Bond Market Idx ADM | 0.05 % | Index | 200% |
| Vanguard Developed Markets Index Inv | 0.16 % | Fidelity® International Index | 0.05 % | Index | 220% |
| Fidelity® Diversified International | 0.81 % | Vanguard Intl Div Apprec Idx Adm | 0.25 % | Int'l Equity | 224% |
| | | Vanguard International Growth Adm | 0.32% | | 151% |
| Lazard Emerging Markets Equity Instl | 1.07 % | Fidelity® Emerging Markets Idx | 0.08 % | Int'l Equity | 1238% |
| | | DFA Emerging Markets Core Equity I | 0.52% | | 105% |
| JPMorgan High Yield R6 | 0.60 % | Vanguard High-Yield Corporate Adm | 0.13 % | Domestic Bond | 362% |
| Vanguard Inflation-Protected Secs Inv | 0.20 % | Fidelity® Inflation-Prot Bd Index | 0.05 % | Domestic Bond | 300% |
| Vanguard Wellington,,¢ Admiral,,¢ | 0.17 % | Vanguard Balanced Index I | 0.06 % | Non-target date balanced | 183% |
| T. Rowe Price US Treasury Money | 0.39 % | Vanguard Treasury Money Market Investor | 0.09 % | Money Market | 333% |

113.    The data for 2017 is not an anomaly.  The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.   The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

114.    Moreover, the Plan's fiduciaries cannot justify selecting actively managed funds over passively managed ones.  As noted above, while higher-cost mutual funds may outperform

39

a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term. With regard to this action in particular, there is objective evidence that selection of actively managed funds over passively managed ones with material characteristics was unjustified. Comparing the five-year returns of the Plan's actively managed funds with those of comparable index funds with lower fees demonstrates that accounting for fees paid, the actively managed funds lagged behind in performance. The chart below indicates the efficiency of the active funds (*i.e.*, whether or not the actively managed funds had better performance than the passively managed funds all else being equal):

| Fund Name/Comparator | Expense Ratio | Return (5 Year) | I.N.D.E.X/Return Deficiency |
|---|---|---|---|
| Fidelity Contra | 0.82 | 12.27 | Fails Efficiency |
| Vanguard Growth Index Admiral | 0.05 | 12.21 | Needs 0.91% more return to pass |
| T. Rowe Price Retirement 2030 | 0.66 | 7.27 | Less than Optimal Efficiency. Needs |
| Vanguard Target Retirement 2030 Inv | 0.14 | 6.90 | 0.27% more return to be efficient |
| T. Rowe Price Retirement 2035 | 0.68 | 7.59 | Less than Optimal Efficiency. Needs |
| Vanguard Target Retirement 2035 Inv | 0.14 | 7.22 | 0.26% more return to be efficient |
| T. Rowe Price Retirement 2040 | 0.70 | 7.84 | Less than Optimal Efficiency. Needs |
| Vanguard Target Retirement 2040 Inv | 0.14 | 7.52 | 0.28% more return to be efficient |
| T. Rowe Price Retirement 2025 | 0.63 | 6.82 | Less than Optimal Efficiency. Needs |
| Vanguard Target Retirement 2025 Inv | 0.13 | 6.56 | 0.35% more return to be efficient |
| T. Rowe Price Retirement 2020 | 0.59 | 6.32 | Less than Optimal Efficiency. Needs |
| Vanguard Target Retirement 2020 Inv | 0.13 | 6.08 | 0.33% more return to be efficient |
| T. Rowe Price Retirement 2045 | 0.71 | 7.96 | Less than Optimal Efficiency. Needs |
| Vanguard Target Retirement 2045 Inv | 0.15 | 7.67 | 0.25% more return to be efficient |
| Fidelity Low Priced Stock | 0.52 | 7.09 | Fails Efficiency |
| Vanguard Mid-Cap Value Index Admiral | 0.07 | 7.77 | Needs 0.54% more return to pass |
| T. Rowe Price Institutional Large Capital Value | 0.57 | 8.04 | Fails Efficiency |
| Vanguard Value Index Adm | 0.05 | 9.52 | Needs 2.01% more return to pass |
| Prudential Jennison Small Company | 0.68 | 7.10 | Fails Efficiency |
| Vanguard Mid-Cap Growth Index Admiral | 0.07 | 9.70 | Needs 3.88% more return to pass |

115.     Defendants failure to investigate lower cost alternative investments during the Class Period cost the Plan and its participants well in excess of 100 Million dollars.  Once the full extent of the Defendants failures to prudently monitor and maintain the investments in the Plan is known through discovery, the amount of damages will be and can be calculated to a mathematical certainty. The damages are not speculative.

**B.      Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses**

116.     Recordkeeping is a necessary service for any defined contribution plan.  The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.  As a result of such competition, vendors vigorously compete for business by offering the best price.

117.     The cost of providing recordkeeping services depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

118.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

119.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must pay close attention to the recordkeeping fees being paid by the plan.  A prudent fiduciary tracks the recordkeeper's expenses by demanding

41

documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

120.    Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

121.    Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

122.    Defendants have wholly failed to prudently manage and control the Plan's recordkeeping costs.  Based on Plaintiffs' investigation and analysis, a normal range of recordkeeping fees for a plan with approximately 10,000 to 15,000 participants with account balances would have been between $45 and $50 per participant from 2010 to 2012, and lower in ensuing years.

123.    For jumbo plans, recordkeeping fees should be even lower.  *See, e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and

defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

124.    The recordkeeping fees paid by the Plan to its recordkeeper, Fidelity Investments, greatly exceeded this reasonable range.  In 2013, the Plan paid and estimated $154.67 per participant.  For 2014 through 2017, the Plan paid an estimated $172.80, $158.88, $139.87, and $122.48 respectively per participant.

125.    A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

### FIRST CLAIM FOR RELIEF
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Teva and Committee Defendants)**

126.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

127.    At all relevant times, the Company and Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

128.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

129.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint.  They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.  The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.  In addition, the Prudence Defendants failed to investigate separate accounts and/or collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost.  Likewise, the Prudence Defendants failed to monitor or control the grossly-excessive compensation paid for recordkeeping services.

130.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered tens of millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

131.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must

restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable

relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

132.    The Prudence Defendants knowingly participated in each breach of the other

Defendants, knowing that such acts were a breach, enabled the other Defendants to commit

breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches

by the other Defendants and failed to make any reasonable and timely effort under the

circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches

of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Teva and the Board Defendants)

133.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this

Complaint as if fully set forth herein.

134.    Teva and the Board Defendants (the "Monitoring Defendants") had the authority to

appoint and remove members of the Committee and were aware that the Committee Defendants

had critical responsibilities as fiduciaries of the Plan.

135.    In light of this authority, the Monitoring Defendants had a duty to monitor the

Committee Defendants to ensure that the Committee Defendants were adequately performing their

fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that

the Committee Defendants were not fulfilling those duties.

136.    The Monitoring Defendants also had a duty to ensure that the Committee

Defendants possessed the needed qualifications and experience to carry out their duties (or used

qualified advisors and service providers to fulfill their duties); had adequate financial resources

and information; maintained adequate records of the information on which they based their

decisions and analysis with respect to the Plan's investments; and reported regularly to Teva and the Board Defendants.

137.     Teva and the Board Defendants breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)     failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost separate account and collective trust vehicles; and

(c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

138.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Teva and the Board Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

139.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Teva and the Board Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the

Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## JURY DEMAND

140.     Plaintiffs demand a jury.

## PRAYER FOR RELIEF

136.     **WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Employer Defendants as necessary to effectuate said relief, and to prevent the Employer Defendants' unjust enrichment;

47

F.       Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.       An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.       Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.       An award of pre-judgment interest;

J.       An award of costs pursuant to 29 U.S.C. § 1132(g);

K.       An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.       Such other and further relief as the Court deems equitable and just.


Respectfully submitted,
**CAPOZZI ADLER, P.C.**


Dated:  December 5, 2019

Donald R. Reavey, Esquire
Attorney ID # 82498
Mark K. Gyandoh, Esquire
Attorney ID # 88587
2933 North Front Street
Harrisburg, PA 17110
(717) 233-4101
Fax (717) 233-4103

Counsel for Plaintiffs and
the Putative Class


48

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JERRY PINNELL, JEREMY FERNANDEZ AND SHANE PERRILLOUZ, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br>TEVA PHARMACEUTICALS USA, INC., BOARD OF DIRECTORS OF TEVA PHARMACEUTICALS USA, INC., DR. SOL J. BARER, KARE SCHULTZ, ROSEMARY A. CRFANE, AMIR ELSTEIN, MURRAY A. GOLDBERG, JEAN-MICHEL HALFON, GERALD M. LIEBERMAN, ROBERTO A. MIGONE, DR. PARRY D. NISEN, NICHEMIA J. PERES, RONIT SATCHI-FAINARO, TEVA PHARMACEUTICALS USA, INC. INVESTMENT COMMITTEE, and JOHN AND JANE DOES 1-30,<br>        Defendants. | :<br>:<br>:<br>:  **CIVIL ACTION NO.:**<br>:<br>:<br>:<br>:<br>:  **CLASS ACTION COMPLAINT**<br>:<br>:  <u>**JURY TRIAL DEMANDED**</u><br>:<br>:<br>:<br>:<br>: |

**<u>CERTIFICATION OF COMPLIANCE</u>**

      I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: <u>Capozzi Adler, P.C.</u>

Signature: *Donald R. Reavey*

Name: <u>Donald R. Reavey, Esquire</u>

Attorney No. (if applicable): <u>82498</u>

Louis J. Capozzi, Jr., Esquire*
Daniel K. Natirboff, Esquire
Donald R. Reavey, Esquire
Craig I. Adler, Esquire**
Andrew R. Eisemann, Esquire***
Glenn A. Parno, Esquire**
Mark Gyandoh, Esquire**
Bruce G. Baron, Esquire
Brandon S. Williams, Esquire
Nicholas J. Luciano, Esquire
Daniel Sullivan, Esquire**
Corey S. Smith, Esquire****
Garrett H. Rothman, Esquire, of Counsel
Donna M. Desfor, Esquire, of Counsel
Timothy T. Ziegler, Sr. Reimb. Analyst
Karen L. Fisher, Paralegal
Linda Gussler, Paralegal
Kelly A. Galski, Paralegal
*(Licensed in PA, NJ and MD)
**(Licensed in PA and NJ)
***(Licensed in PA and NY)
****(Licensed in PA and WA)



# Capozzi Adler, P.C.
## *Attorneys at Law*

**Primary Office:**
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103
www.capozziadler.com

**Mid-Penn Abstract Company**
355 N. 21st Street, Suite 205
Camp Hill, PA 17011
Telephone: (717) 234-3289
Facsimile: (717) 234-1670

December 5, 2019

Prothonotary
James A. Byrne U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

Re:  **Jerry Pinnell, et.al. v. TEVA Pharmaceuticals USA, Inc., et. al.**
Our Matter No.  553-19

Dear Prothonotary:

Enclosed for filing, please find the following documents for filing with the Court:

1. Civil Cover Sheet
2. Case Management Track Designation Form
3. Designation Form
4. Notice of a Lawsuit and Request to Waive Service of a Summons for 14 Defendants
5. Waiver of the Service of Summons for 14 Defendants
6. Civil Action Complaint
7. Certification of Compliance
8. CD containing complete copy of documents
9. Check in the amount of $400.00 to cover the filing fee.

Please let me know if you have any questions or need additional information.

Sincerely,

Linda Gussler, Paralegal

Enclosures